UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOI LYNN KELLER and JOEL KELLER,           )
individually and on behalf of their minor child,  )
REECE KELLER,                              )
            Plaintiffs,                    )
                                           )
                                           )
            v.                             )        Civil No. 3:20-cv-30187-KAR
                                           )
                                           )
THE TOWN OF MONSON,                        )
CHERYL CLARKE, WILLIAM METZGER,            )
SUZANNE MORNEAU, JILL FOULIS,              )
VERONICA SLATTERY,                         )
JESSICA COLDWELL,                          )
LORI HESS, ERIC DEGNAN, and                )
JOHN LEMPART,                              )
            Defendants.                    )

REVISED MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt No. 48)

ROBERTSON, U.S.M.J.

        Joi Lynn Keller ("Joi Lynn") and Joel Keller ("Joel") (collectively, "the Kellers"),

individually and on behalf of their minor child Reece Keller ("Reece," and collectively, with Joi

Lynn and Joel, "Plaintiffs"), bring this action against the defendants the Town of Monson ("the

Town" or "Monson"), Cheryl Clarke ("Clarke"), William Metzger ("Metzger"), Suzanne

Morneau ("Morneau"),[1] Jill Foulis ("Foulis"), Veronica Slattery ("Slattery"), Jessica Coldwell

("Coldwell"), Lori Hess ("Hess"),[2] Eric Degnan ("Degnan"), and John Lempart ("Lempart")

---

[1] Morneau's last name is now Tetrault, but to avoid confusion, she will be referred to in this document by her name at the time.
[2] Hess's last name is now Duga, but she also will be referred to in this document by her name at the time.

(collectively, "Defendants") alleging federal claims under 42 U.S.C. § 1983 (Counts I and II), as well as state law claims for violation of the Massachusetts Civil Rights Act ("MCRA") (Count III), negligence (Count IV), negligent infliction of emotional distress (Count V), intentional infliction of emotional distress (Count VI), and loss of consortium (Count VIII).[3]  Presently before the court is Defendants' motion for summary judgment on all remaining counts of Plaintiffs' amended complaint.  The parties have consented to this court's jurisdiction (Dkt. No. 6).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, Defendants' motion for summary judgment (Dkt. No. 48) is GRANTED with respect to Counts I and II alleging federal claims under 42 U.S.C. § 1983, Count III for violation of the MCRA insofar as it is based on the deprivation of Reece's right to be free from the excessive use of force under the fourth amendment to the United States Constitution, and Count VI for intentional infliction of emotional distress.  However, the motion is DENIED with respect to Count III for violation of the MCRA insofar as it is based on Reece's right to a public education under the Massachusetts Constitution, Count IV for negligence, Count V for negligent infliction of emotional distress, and Count VIII for loss of consortium.  These state law claims are remanded to state court.

## I.      LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is

---

[3] The court previously dismissed Count VII of Plaintiffs' amended complaint alleging a violation of Title II of the Americans with Disabilities Act ("ADA") based on their failure to administratively exhaust the claim (Dkt. No. 26).

'material' when its (non)existence could change a case's outcome.  *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute."  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

## II.    FACTUAL BACKGROUND[4]

At approximately fourteen months old, Reece Keller became non-verbal and began to engage in self-injurious behaviors, including banging his forehead on his crib and the floor, leading to a diagnosis of autism spectrum disorder (Dkt. No. 50 at ¶¶ 2, 4, 6).  As a result of his condition, Reece is hypersensitive to certain audio stimulation, particularly high frequency sounds, which can trigger agitation, anxiety, and self-injury (Dkt. No. 50 at ¶ 5).  Reece can become aggressive in response to attempts to prevent his self-injurious behaviors, and he has a

---

[4] The court draws the facts from the parties' Local Rule 56.1 statements of material facts, as well as the affidavits, depositions, and other documentation submitted in support.  *See* Dkt. No. 50, 66.  Unless specified otherwise, the facts are undisputed.

history of being restrained in school (Dkt. No. 50 at ¶ 5; Dkt. No. 66 at ¶ 19).  Before high

school, however, Reece had never sustained a serious injury or had to consult a doctor due to the

imposition of a restraint in school (Dkt. No. 66 at ¶ 18).

The Monson School District held an annual IEP meeting for Reece in the spring of 2017,

in advance of Reece starting high school in the fall (Dkt. No. 66 at ¶ 24).  The IEP team

formulated a plan to replicate the process of Reece's transition from elementary school to middle

school, wherein staff from the elementary school trained the teacher and paraprofessionals at the

middle school in how best to respond to and work with Reece (Dkt. No. 66 at ¶¶ 4-5, 42).

Morneau, who had taken over as Director of Pupil Services/Special Education Director shortly

before Reece's eighth grade year, proposed eliminating a provision that had been part of Reece's

IEP since at least the fourth grade requiring that all staff working with Reece complete a state-

recognized restraint program with certification (Dkt. No. 50 at ¶ 26; Dkt. No. 66 at ¶¶ 8, 22, 26).

Joi Lynn rejected this change to Reece's IEP and invoked "stay put," meaning that this

requirement remained in place (Dkt. No. 66 at ¶ 27).

In late May and early June of 2017, Lempart, a special education teacher who taught

Reece from fifth through eighth grade, attended a three-day training on the Safety Care restraint

methodology and become a certified Safety Care trainer (Dkt. No. 50 at ¶¶ 11, 36).  Lempart

then trained others, including Principal Metzger, Dean of Students Foulis, special education

teacher Hess, general education teacher Degnan, and paraprofessionals Slattery, Coldwell, and

Valencourt, in the Safety Care method (Dkt. No. 50 at ¶ 37)[5].  The trainings, which consisted of

_____

[5] Plaintiffs do not dispute that Lempart trained these individuals but do dispute that Degnan,
Metzger, and Coldwell received "in-depth training" because the certifications they provided
reflect less than sixteen hours of training, which Plaintiffs maintain is the minimum required for
the in-depth designation (Dkt. No. 66 at ¶ 51; Dkt. No. 71-1).

both a classroom and a hands-on component and included instruction on de-escalation techniques, were held in multiple small group sessions lasting two-to-three days each (Dkt. No. 50 at ¶¶ 38-40).  Lempart's training sessions were intended for general application, not just for working with Reece (Dkt. No. 50 at ¶ 41).  Staff were not trained to restrain Reece using specific techniques in a rote manner, but rather to apply their training as necessary to specific circumstances confronting them (Dkt. No. 50 at ¶ 41).  According to Defendants, Reece's behavior support plan ("BSP") did not specify how Reece was to be restrained or prescribe the use of particular techniques or methodologies (Dkt. No. 50 at ¶ 35).  Plaintiffs purport to dispute this fact, noting that a June 14, 2017, update to Reece's BSP provided that when Reece engaged in self-injurious behavior level 3, which is defined, he was to be prompted to "take a break on his mat" (Dkt. No. 53-11 at p. 3; Dkt. No. 66 at ¶ 14).  Staff carried the referenced 3' x 6' foam mats with Reece throughout the school day; according to Plaintiffs, the mats were intended to give Reece a soft place to go and to reduce the amount of space between him and the floor, thereby minimizing the possibility of injury to his head (Dkt. No. 66 at ¶¶ 11-12).  Joi Lynn maintains that before Reece's ninth grade year, if a restraint became necessary, staff were trained to direct Reece down onto his mats to avoid injury (Dkt. No. 66 at ¶ 15).  Valencourt testified that it was the normal course before Reece began high school for Reece to go down to the floor on his mats himself before a restraint (Dkt. No. 69-6 at 4).

The Safety Care methodology was a new one for Monson; in previous years, Monson had contracted with Crisis Intervention Solutions, Inc. ("CIS") to provide annual restraint training in its methodology (Dkt. No. 50 at ¶ 24; Dkt. No. 66 at ¶¶ 9-10).  Morneau, who had experience with Safety Care in an earlier role as assistant director of student services for another school district, had recommended the change from CIS to Safety Care (Dkt. No. 50 at ¶¶ 28-29).

Clarke, the Superintendent of the Monson School District, approved the change because she understood that Safety Care was used across the state and country, while CIS "was kind of a one-man show," and because of Safety-Care's "train-the-trainer" model that allowed for training to be conducted in district (Dkt. No. 50 at ¶¶ 27, 31-32).  Joi Lynn learned CIS would no longer be providing restraint training to the District in April 2017, but maintains that Morneau assured her that Reece would continue to use the mats, and the District would continue with what had been in place (Dkt. No. 67 at ¶ 16).

In connection with Reece's transition to high school, administrators and staff from the middle school and high school held multiple planning meetings, which Joi Lynn and Joel attended (Dkt. No. 50 at ¶ 19).  In addition, Reece visited the high school multiple times so that he could become familiar with his classroom, in which Monson had installed carpets to deaden sound, and with Hess, who was to be his high school special education teacher (Dkt. No. 50 at ¶¶ 21, 22).  Hess, in turn, observed Reece at the middle school at least five times before he started at the high school (Dkt. No. 50 at ¶ 21).  Nevertheless, Plaintiffs had concerns that the high school was not fully prepared for Reece to start (Dkt. No. 66 at ¶ 34).  Paraprofessionals Slattery and Coldwell were assigned to work with Reece exclusively at the high school; Valencourt was also assigned to work with Reece, but Plaintiffs dispute Defendants' representation that she was to work with Reece exclusively  (Dkt. No. 50 at ¶ 23).  While Valencourt and Slattery had worked with Reece while he was in middle school beginning in seventh and eighth grade, respectively, as well as during summer school immediately preceding his ninth-grade year, Plaintiffs viewed Slattery as still "new" to Reece (Dkt. No. 50 at ¶¶ 13-16; Dkt. No. 66 at ¶ 34).

Two days before Reece was to start ninth grade, Joi Lynn spoke to Morneau reminding her of the IEP Team's plan to replicate the process of Reece's transition from elementary to

middle school and suggesting that Valencourt go to the high school to train Slattery, Coldwell, and Hess (Dkt. No. 66 at ¶ 42).  Morneau agreed to have Valencourt at the high school for two weeks for training purposes, but the day before school was to start, Joi Lynn learned that Morneau was only going to have Valencourt at the high school for the first two days and for two hours only to greet Reece upon his arrival and help him get settled, and then would re-evaluate the need to have her there every two days thereafter (Dkt. No. 66 at ¶¶ 44-47).

On August 30, 2017, Reece, who was 5' 7.25" tall and weighed 159.2 pounds, started ninth grade at Monson High School (Dkt. No. 50 at ¶¶ 18, 23; Dkt. No. 66 at ¶ 18).  Within Reece's first month at the high school, he was restrained on three separate days, including August 31, September 14, and September 22, 2017, after engaging in self-injurious behavior (Dkt. No. 50 at ¶¶ 51, 55, 58, 62).  Plaintiffs attribute the need for these restraints to a challenging transition for Reece, particularly in tolerating the noise level in the classroom and the frequent beeping of announcements over the PA system, which Plaintiffs maintain the District never made any attempt address (Dkt. No. 66 at ¶¶ 53-54, 90).

Valencourt, Hess, Slattery, and Coldwell administered the August 31, 2017, restraint, while Metzger and paraprofessional Maria Darling ("Darling") observed it (Dkt. No. 50 at ¶ 56; Dkt. No. 66 at ¶ 63).  Reece was evaluated by the school nurse following the August 31, 2017, restraint (Dkt. No. 50 at ¶ 57).  Immediately after the restraint, Joi Lynn took Reece to an emergency appointment with his pediatrician, who diagnosed Reece with a concussion (Dkt. No. 66 at ¶¶ 69-70).  According to Joi Lynn, she told Hess that Reece had sustained a concussion, but Hess has no recollection of having been so informed (Dkt. No. 66 at ¶¶ 71, 73).  It is undisputed that the Monson School District did not receive any notification from a medical professional that Reece had suffered a concussion until after September 27, 2017 (Dkt. No. 50 at ¶ 76).

Joi Lynn received a written restraint report regarding the August 31, 2017, restraint in the mail on September 7, 2017 (Dkt. No. 66 at ¶ 74).  The restraint report indicates that Reece made contact with his head to a table and the floor before the restraint began, that before the restraint was administered Reece was asked to take deep breaths and was given calming instructions in accordance with the Safety Care protocol, and that the holds that were utilized included a 2-person chair stability hold transitioning to a 3-person supine stability floor hold (Dkt. No. 66 at ¶ 74, Dkt. No. 53-22).  Morneau was notified about the restraint and reviewed the restraint report documenting it (Dkt. No. 50 at ¶ 54).  Defendants produced a different report for the August 31, 2017, restraint in discovery (Dkt. No. 66 at ¶ 81; Dkt. No. 69-7).  The later produced report includes injuries to staff, including Valencourt, Coldwell, and Hess (Dkt. No. 69-7 at 3).

The same individuals – Valencourt, Slattery, Coldwell, and Hess – administered another restraint on September 14, 2017,  which Darling observed; according to Coldwell, although denied by Foulis, Foulis "took over" for her after they had gotten Reece to the ground (Dkt. No. 50 at ¶ 59; Dkt. No. 66 at ¶ 103).  Coldwell testified that immediately before the restraint – and the reason staff had to intervene – Reece began hitting his head on a radiator (Dkt. No. 66 at ¶ 97).  While not reflected in the report regarding this restraint and denied by Coldwell in her deposition, Valencourt testified that she thought a "chair hold" was involved (Dkt. No. 66 at ¶ 100).  Later that afternoon, when Joi Lynn learned of the restraint and went to the high school, she met with Hess and Metzger and told them that loud noises in the classroom were what was setting Reece off and the beeping of announcements over the PA system were especially hard on him (Dkt. No. 66 at ¶¶ 86, 89).  Following the September 14, 2107, restraint, Morneau did not engage in discussion about changing the method of restraint from the Safety-Care method in use at the school to avoid injury to Reece because staff were certified in the Safety-Care method, the

trainer was available, no one else suggested changing the restraint methodology, and staff debriefed after each restraint (Dkt. No. 50 at ¶ 61).

According to Defendants, only one restraint was administered on Reece on September 14, 2017. However, Plaintiffs maintain that Monson School District records reveal that Reece was restrained twice that day, even though only one report was created (Dkt. No. 66 at ¶¶ 51, 54). Plaintiffs rely on a nurse's log produced in discovery reflecting two visits with the school nurse on September 14, 2017 (Dkt. No. 67 at ¶ 49, Dkt. No. 53-23 at pp. 3-4). According to the log, K. Ramsland, RN, was "[c]alled to Room 215 [status post] hold" at 8:48 a.m., where she found Reece lying on a mat on the floor and assessed him as having sustained various injuries, including rug burns under his right ear, on his forehead, and on his right outside elbow, bruises on his forehead, and red marks or scratches on his left wrist, inner right forearm, left outer shin, left armpit, and left antecubital area (Dkt. No. 53-23 at p. 4). At 9:00 a.m., Ramsland discharged Reece back to class without administering any treatment (Dkt. No. 53-23 at p. 4). Thereafter, at 9:40 a.m., Reece presented to Ramsland complaining of pain and discomfort "[status post] hold" (Dkt. No. 53-23 at p. 3-4). Ramsland noted that Reece "was hitting [his] head on the floor," and he had "some bruising/rug burn to his forehead" (Dkt. No. 53-23 at p. 4). She dispensed ibuprofen and sent Reece back to class (Dkt. No. 53-23 at p. 4).

The court rejects Plaintiffs' speculative assertion that this record, reflecting two encounters with the school nurse that morning, without any other evidence to support it, establishes that Reece was restrained a second time on September 14, 2017 (Dkt. No. 67 at ¶ 49).[6] The only reasonable inference to draw from the nurse's log is that Reece was seen in the

---

[6] Unsupported speculation is not sufficient to establish a disputed fact in opposition to a properly supported summary judgment motion. *Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts*, 87 F.4th 62, 77 (1st Cir. 2023)

classroom by the nurse immediately after the restraint and then a second time forty minutes later when he complained of pain and discomfort resulting from the same restraint, at which time the nurse dispensed Motrin (a brand name for ibuprofen).

Joi Lynn received a written restraint report regarding the September 14, 2017, restraint in the mail on September 21, 2017 (Dkt. No. 66 at ¶ 91).  According to the report, Reece began hitting his head with his hand and then on the floor and engaged in injurious behavior toward staff when he was asked to transition back to morning meeting (Dkt. No. 53-24 at 4).  Staff tried to de-escalate by asking Reece to take deep breaths and have a calm body, giving Reece a warning that he would lose his preferred reinforcements if a restraint was needed, and providing calming instructions in accordance with Safety Care protocol (Dkt. No. 53-24 at 4).  The restraint administered consisted of a "3 (+1) Person Supine Stability Floor Hold" lasting for approximately ten minutes (Dkt. No. 53-24 at 4).  The report does not include any mention that Reece banged his head on a radiator, but it does indicate that Reece's head made contact with the floor when Reece moved off of his mat, which was "in use" (Dkt. No. 53-24 at 3; Dkt. No. 66 at ¶ 98).  According to the report, Reece was examined by the school nurse and given Motrin following the restraint and that, in addition to Reece, Valencourt, Hess, and Coldwell all sustained injuries (Dkt. No. 53-24 at 3).

Finally, the September 22, 2017, restraint was administered by Valencourt, Hess, Slattery, Foulis, Metzger, and Degnan and was observed by Darling (Dkt. No. 50 at ¶ 63).  Reece once again was evaluated by the school nurse following the restraint (Dkt. No. 50 at ¶¶ 57, 64).  She advised Principal Metzger to call emergency medical services ("EMS") because Reece had

_____

(quoting *Balser v. Union of Elec., Elec., Salaried, Mach. & Furniture Workers (IUE) Loc. 201*, 661 F.3d 109, 118 (1st Cir. 2011)).

lost consciousness, although Plaintiffs argue that the records show that over fifty minutes elapsed between the end of the restraint, and nine between Reece's loss of consciousness, and the call to EMS (Dkt. No. 50 at ¶ 66; Dkt. No. 66 at ¶¶ 131-133).  Because the restraint report and EMS records made no mention of it, Reece's parents did not learn that Reece had lost consciousness until Principal Metzger's deposition (Dkt. No. 66 at ¶¶ 127-128, 130).  When Joi Lynn and Joel arrived at the high school following the September 22, 2017, restraint, they observed Reece lying by himself on his bean bag chair under a blanket with no one, including the two EMS personnel on scene, attending to him (Dkt. No. 66 at ¶ 113-115).  According to Monson Fire Department records, Principal Metzger and "other staff" told the EMS personnel that Reece's parents "want[ed] to hold off on any further contact/interaction to prevent another incident," but neither Joi Lynn nor Joel had communicated such a directive to anyone in the District (Dkt. No. 66 at ¶¶ 124, 126).  There is no indication in the records that the EMS personnel were told Reece had banged his head that morning (Dkt. No. 66 at ¶ 125).  Reece's parents decided to transport Reece to an emergency appointment with his pediatrician rather than have EMS transport him to a hospital (Dkt. No. 50 at ¶ 67; Dkt. No. 66 at ¶¶ 120, 126).  Reece was diagnosed as having sustained another concussion, which Joi Lyn claims she reported to Lempart (Dkt. No. 66 at ¶¶ 123, 137).  This was Reece's last day attending Monson High School (Dkt. No. 50 at ¶ 69).

At some point the following week, Joi Lynn and Joel received a restraint report dated September 25, 2017, regarding the incident in the mail (Dkt. No. 66 at ¶ 129).  According to the report, despite Reece having been given his noise-cancelling headphones, announcements over the loudspeaker led to Reece hitting himself and the furniture and being aggressive toward staff (Dkt. 53-25 at 4).  Staff attempted to de-escalate with "help, prompt, and wait" strategies paired with deep breathing (Dkt. No. 53-25 at 4).  When de-escalation was unsuccessful, staff

implemented a chair stability hold for six minutes, but when Reece freed an arm and began grabbing Hess's hair and head butting her, they transitioned to a floor supine hold and lowered Reece from a standing position to the mats on the floor (Dkt. No. 53-25 at 4).  During the floor hold, Reece moved his upper torso off the mat and hit his head on the floor (Dkt. No. 53-25 at 5). The report lists Degnan, Metzger, and Hess as also sustaining injuries, with Hess in particular being taken to the hospital by ambulance and being diagnosed with a partial concussion (Dkt. No. 53-25 at 3).  Hess, however, testified in her deposition that she did not think she got a concussion and that she refused to go to the hospital (Dkt. No. 66 at ¶ 139; Dkt. No. 53-26 at pp. 3-4).

In the evening on September 22, 2017, before receiving the restraint report, the Kellers received an email with an attached letter from Foulis, which was sent before staff debriefed about the restraint (Dkt. No. 50 at ¶ 70; Dkt. No. 66 at ¶¶ 142-143).  The letter stated: (1) that Reece had committed physical assault on members of the high school staff on September 22, and September 13, 2017; (2) that the District would conduct a determination of whether the assaults were caused by or related to his disability or a direct result of failure to implement his IEP, in which case the District reserved the right under the IDEA to unilaterally change Reece's placement to an interim alternative educational setting for 45 days; and (3) that if the District determined the assaults were not a manifestation of his disability, it would hold a formal long-term suspension/expulsion hearing (Dkt. No. 50 at ¶ 70; Dkt. No. 66 at ¶ 144).  The Kellers ended up agreeing to send Reece to a 45-day evaluation as a day student at the Center for Applied Behavioral Institute ("CABI"), located nearly an hour from their home, after Morneau indicated that she would place Reece into a residential setting (Dkt. No. 50 at ¶¶ 72-73; Dkt. No. 66 at ¶¶ 147-148).  CABI also utilized the Safety Care method of restraint, and, while Reece was

at CABI, he was restrained 24 times over 22 days, none of which resulted in injury to Reece or involved the use of a chair restraint method (Dkt. No. 50 at ¶ 75; Dkt. No. 66 at ¶ 161).

Plaintiffs maintain that in the aftermath of the three restraints, Reece sustained at least two concussions, had frequent headaches, tired easily, slept every afternoon, missed school for approximately two months, was sensitive to both light and sound, had slurred speech, and was highly irritable (Dkt. No. 66 at ¶ 155). Months later, on March 15, 2018, when Reece arrived at CABI, he developed tremors in his head and eyes, prompting Joi Lynn to take Reece to his physician (Dkt. No. 66 at ¶ 159). In the weeks that followed, Reece had migraines, nausea, severe anxiety, and vomited blood on two occasions (Dkt. No. 66 at ¶ 159). Since Reece's time at Monson High School, Reece has been diagnosed with post-concussion syndrome, post-traumatic stress disorder, and a decline in his cognitive abilities (Dkt. No. 66 at ¶ 162).

The Monson School District had a physical restraint policy and a head injury management protocol in effect during Reece's ninth-grade year (Dkt. No. 50 at ¶¶ 42, 50). The restraint policy had been recently updated to reflect revisions to regulations issued by the Commonwealth of Massachusetts' Department of Elementary and Secondary Education ("DESE") (Dkt. No. 50 at ¶ 43). It was part of the student handbook, which was approved by the Monson School Committee and distributed to teachers on an annual basis, and was publicly available on the school district's website (Dkt. No. 50 at ¶¶ 44-45, 47). At some point before September 30, 2017, Monson distributed an annual mandatory training in the form of a PowerPoint presentation to all staff, which included an overview of physical restraint requirements (Dkt. No. 50 at ¶ 48). While Plaintiffs acknowledge that Metzger, Foulis, Lempart, Coldwell, Slattery, Valencourt, Hess, Ramsland, and Degnan all certified that they completed the training, they note that none of them completed it until after each of the restraints at issue and,

with respect to Metzger, Foulis, Lempart, Coldwell, and Slattery, not until after the first month of school (Dkt. No. 50 at ¶ 49; Dkt. No. 66 at ¶ 49).

### III.   DISCUSSION

### A.   Count I: Supervisory Liability Under 42 U.S.C. § 1983

In Count One of their amended complaint, Plaintiffs state a claim for supervisory liability under 42 U.S.C. § 1983 against Clarke, Metzger, Morneau, Foulis, and Lempart (collectively, the "Supervisory Defendants") in connection with the three restraints of Reece at Monson High School.  "[A] supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority." *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016) (citing *Ramírez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014)).  Rather, to establish supervisory liability, a plaintiff must show that the supervisor was a "'primary violator or direct participant in the rights-violating incident,'" *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)), or one of the supervisor's subordinates abridged the plaintiff's constitutional rights and that "'the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference.'" *Guadalupe-Báez*, 819 F.3d at 515 (alterations in original) (quoting *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008)).  Deliberate indifference requires a plaintiff to demonstrate "'(1) a grave risk of harm, (2) the defendant's actual knowledge or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk.'" *Justiniano v. Walker*, 986 F.3d 11, 20 (1st Cir. 2021) (quoting *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998)).  Mere negligence is insufficient; instead, "'the supervisor's conduct must

evince "reckless or callous indifference to the constitutional rights of others."'" *Id*. (quoting *Guadalupe-Báez*, 819 F.3d at 515). Additionally, a plaintiff must show causation consisting of "'proof that the supervisor's conduct led inexorably to the constitutional violation.'" *Id*. (quoting *Guadalupe-Báez*, 819 F.3d at 515). In other words, "the plaintiff in a Section 1983 action must show 'an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization.'" *Sanchez*, 590 F.3d at 49 (quoting *Camilo-Robles*, 175 F.3d at 44). In the latter case, such causation may be established by "'showing inaction in the face of a "known history of widespread abuse sufficient to alert a supervisor to ongoing violations."'" *Id*. at 21 (*Guadalupe-Báez*, 819 F.3d at 515).

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Accordingly, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker*, 443 U.S. at 140). In deciding Defendants' motion to dismiss, this court determined that Plaintiffs' § 1983 claims are governed by the fourth amendment (Dkt. No. 26 at pp. 11-13). Plaintiffs claim that Reece's fourth amendment rights were violated when Reece was subjected to illegal chair restraints on each of the three occasions, which resulted in his sustaining two diagnosed concussions. In making this argument, Plaintiffs rely on 603 C.M.R. 46.01 *et seq*., which governs the use of physical restraint on students in Massachusetts public schools. The regulations do not directly address chair restraints, but prohibit the use of "[m]echanical restraint[s]," 603 C.M.R. 46.03 (1)(a), which are defined as "any physical device or equipment to restrict a student's freedom of movement …. [not] includ[ing] devices … that have been prescribed by an appropriate medical or related services

professional, and are used for the specific and approved positioning or protective purposes for which such devices were designed."  603 C.M.R. 46.02.  Plaintiffs note that the District's restraint policy also prohibited the use of "mechanical restraints" unless explicitly authorized by a physician and approved in writing by a parent (Dkt. No. 53-18 at 2), neither of which occurred with respect to the use of a chair to restrain Reece.  Finally, Plaintiffs argue that the chair restraints conflicted with Reece's BSP, which provided that "[w]hen Reece engages in continuous intense contact to his head, legs, chest, and/or arms along with other target behaviors such as aggression contacts to staff, hits to furniture, loud vocalizations, and/or crying …. [p]rompt Reece to take a break on his mat, use visual cues and also model taking deep breaths" (Dkt. No. 53-11 at 3).  None of the three restraint reports indicate that Reece was prompted to go to his mats before the restraint was administered.

According to Plaintiffs, Clarke, Metzger, Morneau, Foulis, and Lempart may all be liable as supervisors because each was aware of the District's policy against mechanical restraints and yet directly encouraged or at least condoned the use of the Safety Care chair restraint methodology on Reece, a method which Lempart in fact taught as a Safety Care trainer, in violation of the school's policy and Massachusetts restraint regulations.  Plaintiffs note that Metzger participated in the third restraint, while Foulis participated in the second and third restraints, and both acknowledged that an improper restraint procedure can result in injury to a student.  Plaintiffs claim that the evidence is sufficient to create a disputed issue of material fact that the actions (or inactions) of the Supervisory Defendants led to fourth amendment violations.

Plaintiffs' argument is not persuasive.  As set forth above, to establish supervisory liability, Plaintiffs must show that the Supervisory Defendants directly participated in a fourth amendment violation or that one of the Supervisory Defendants' subordinates violated Reece's

fourth amendment rights.  However, viewing the record in the light most favorable to Plaintiffs and drawing all inferences in their favor, Plaintiffs have failed to establish that a fourth amendment violation occurred.

"Excessive force claims are premised on the Fourth Amendment right to be free from unreasonable seizures." *Penate v. Sullivan*, 73 F.4th 10, 20 (1st Cir. 2023) (citing *Graham*, 490 U.S. at 395-96).  Because public school students enjoy "less than the full constitutional liberty protection afforded those persons not in school," *Wallace ex rel. Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995), deprivations of liberty in schools often "serve the end of compulsory education and do not inherently pose constitutional problems." *Id*. at 1014.  "A school seizure requires that a 'limitation on the student's freedom of movement … significantly exceed that inherent in everyday, compulsory attendance.'" *Doe v. Aberdeen Sch. Dist.*, 42 F.4th 883, 890 (8th Cir. 2022), *reh'g denied*, No: 21-3269, 2022 WL 3754007 (8th Cir. Aug. 30, 2022) (quoting *Couture v. Bd. of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1251 (10th Cir. 2008)).  Here, while the parties do not explicitly address the issue, there can be no doubt that the three physical restraints administered on Reece in the fall of 2017 significantly exceeded the limitation on freedom of movement a child usually experiences in a public school setting, thereby implicating the fourth amendment.  *See Doe*, 42 F.4th at 891 (holding that "forcibly restrain[ing] … [students] for appreciable periods of time … went beyond normal limitations on public school students" (citing *Doe ex rel. Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003))).

"The question now becomes whether the qualifying seizures were reasonable." *Id*. (citing *Elkins v. United States*, 364 U.S. 206, 222 (1960)).  "The reasonableness of a Fourth Amendment seizure of a public school student by a teacher must be evaluated in the context of the school

environment, where restricting the liberty of students is a *sine qua non* of the educational

process." *Id.* at 1013-14. *See also Doe*, 42 F.4th at 891 ("In the public school setting, '[t]he

Fourth Amendment's reasonableness inquiry ... must account for "the schools' custodial and

tutelary responsibility" over the students entrusted to their care.'" (alterations in original)

(quoting *Shade v. City of Farmington*, 309 F.3d 1054, 1059 (8th Cir. 2002))). "To maintain

order and discipline, a teacher or administrator may need to seize a student 'in the face of

provocative or disruptive behavior.'" *Price ex rel. J.K. v. Mueller-Owens*, 516 F. Supp. 3d 816,

828 (W.D. Wis. 2021) (quoting *Wallace*, 68 F.3d at 1014). Thus, "in the context of a public

school, a teacher or administrator who seizes a student does so in violation of the Fourth

Amendment only when the restriction of liberty is unreasonable under the circumstances then

existing and apparent." *Wallace*, 68 F.3d at 1014. *Cf. Morelli v. Webster*, 552 F.3d 12, 23 (1st

Cir. 2009) ("To establish a Fourth Amendment excessive force claim, a plaintiff must show that

the defendant employed force that was unreasonable under all the circumstances." (citing

*Graham*, 490 U.S. at 396; *Asociación de Periodistas de P.R. v. Mueller*, 529 F.3d 52, 59 (1st Cir.

2008))). "In evaluating reasonableness, courts may consider factors such as the school context,

the student's age, size, and demeanor, relationship between the need for force and the amount

used, the extent of the student's injury, whether the student presented a safety concern and

whether the student was actively resisting." *Price*, 516 F. Supp. 3d at 828 (citing *Kingsley v.

Hendrickson*, 576 U.S. 389, 397 (2015); *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 184 (4th Cir.

2018)). Where treatment of a disabled student by school personnel is "'not a *substantial

departure* from accepted professional judgment, practice, or standards,'" it is "not unreasonable

in the constitutional sense." *C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347*, 591 F.3d 624,

633 (8th Cir. 2010) (quoting *Heidemann v. Rother*, 84 F.3d 1021, 1030 (8th Cir. 1996)).

Because Plaintiffs have not disputed that it was appropriate for Reece to be restrained under the circumstances presented on each of the three occasions, namely Reece's engaging in self-injurious behavior and the safety concerns it raised, the sole question is whether Defendants used excessive force in administering the restraints.  Plaintiffs contend that the chair restraints that were imposed on Reece on each of the three occasions were unreasonable because they violated Massachusetts regulations prohibiting the use of mechanical restraints unless prescribed by an appropriate medical or related services professional, as well as school district policy and Reece's BSP.  Assuming *arguendo* that a chair qualifies as a "mechanical restraint" within the meaning of the regulations and the policy (a matter of doubt), "[a] lack of compliance with state law or procedure does not, in and of itself, establish a constitutional violation …." *Irish v. Fowler*, 979 F.3d 65, 77 (1st Cir. 2020). *See also Stamps v. Town of Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016) (noting that training and procedures might be relevant to the fourth amendment violation but "do not … establish the constitutional standard").  Indeed, "violations of a statue or regulations [do not even] constitute negligence per se; they are only some evidence of negligence." *St. Germaine v. Pendergast*, 584 N.E.2d 611, 620 (Mass. 1992) (citations omitted).  Thus, even assuming Defendants violated the regulations, Plaintiffs must still establish that restraining Reece while he was sitting in a chair was an unreasonable use of force under all the circumstances presented at the time.

It is undisputed that on each of the three occasions, Reece was engaging in self-injurious behavior, and posed a danger at least to himself at the time the restraints were administered.  It is undisputed that de-escalation techniques were attempted before each restraint but were unsuccessful.  The record does not support a finding that the amount of force used was disproportionate to Reece's behavior, was applied for longer than was necessary to address the

behavior,[7] or constituted a substantial departure from accepted professional judgment or practice. Further, while Reece sustained concussions on two of the occasions, the record does not establish that the concussions were the result of any of the defendants imposing an excessive amount of force during the restraints as opposed to Reece's actions in hitting his head on various surfaces immediately before the restraints or resisting the restraints while they were being administered. Plaintiffs complain that the restraint reports do not reflect that Reece was prompted to go to his mats as provided in his BSP, but the record shows that this was a calming strategy, not a type of restraint (Dkt. No. 53-11 at 3 (indicating that "Reece can … be prompted to take a break on his mat as a calming strategy"). Moreover, while Plaintiffs argue that the use of a chair restraint violated the prohibition on mechanical restraints in 603 C.M.R. 46.03(1)(a), the record does not establish that Plaintiffs' preferred method of restraint would have been in compliance with the regulations either. Plaintiffs advocate that Reece should have been directed to and restrained on his mats as a standard response every time Reece became dysregulated, but 603 C.M.R. 46.03(2)(d) prohibits individual behavior plans from including "physical restraint as a standard response to any behavior." Finally, notwithstanding the particular provisions addressing the use of mechanical restraints, the regulations match the limits of the fourth amendment, specifically providing that they do not "preclude[ ] any teacher, employee or agent of a public education program from using *reasonable force* to protect students, other persons or themselves from assault or imminent, serious, physical harm." 603 C.M.R. 46.01(3) (emphasis added). And aside from arguing that the use of the chair restraints violated Massachusetts regulations, Plaintiffs have made no effort to show that they were objectively unreasonable. For these reasons,

---

[7] Plaintiffs claim in their opposition that use of a chair to restrain Reece prolonged the restraints, but they offer no evidence supporting this contention (Dkt. No. 65 at 6).

Plaintiffs have failed to show an underlying fourth amendment violation by any of the Supervisory Defendants who participated in the restraints or by their subordinates.

In resisting Defendants' motion for summary judgment, Plaintiffs invoke not only the fourth amendment, but also Reece's fourteenth amendment right to be free from intrusions into his bodily integrity. As stated above, the court previously determined that Plaintiffs' § 1983 claim were appropriately analyzed under the fourth amendment reasonableness standard. However, assuming Plaintiffs may avail themselves of the fourteenth amendment's more rigorous shocks the conscience standard, they have still failed to show a constitutional violation. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (explaining that "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as 'arbitrary, or conscience shocking, in a constitutional sense'" (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). In *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168 (3d Cir. 2001), the Third Circuit identified four elements of the shocks the conscience standard when addressing a claim of excessive force by public school officials:

> a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c) Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury?

*Id*. at 173. Viewing the record in the light most favorable to Plaintiffs, no reasonable jury could find that the restraints used on Reece shock the conscience. It is undisputed that Reece was engaging in self-injurious behavior before each of the three restraints and posed a danger to himself, providing Defendants with an appropriate pedagogical reason for using force to restrain him. Indeed, Plaintiffs do not dispute that Reece needed to be restrained, but rather, only the

manner in which he was restrained.  Further, the undisputed evidence supports the conclusion

that the force used was no greater than necessary to address the danger Reece was presenting to

himself.  For example, there are no allegations nor evidence that any of the individuals

administering the restraints acted more forcefully than was necessary or that any of the restraints

lasted for longer than was appropriate.  Turning to the third factor, the record supports no

conclusion other than that the force used in administering the restraints was applied in a good

faith effort to prevent Reece from harming himself, not to intentionally harm Reece.  There is no

evidence that any of the individuals administering the restraints acted with malice toward Reece

or in a sadistic fashion.  Finally, while Plaintiffs have presented undisputed evidence that Reece

sustained concussions following at least two of the restraints, the court finds, as a matter of law,

that Defendants' conduct as a whole does not rise to the level of "'a brutal and inhumane abuse

of official power literally shocking to the conscience'" such as could support a substantive due

process violation.  *Gottlieb*, 272 F.3d at 175 (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th

Cir. 1980)).  *See, e.g., MG ex rel. LG v. Caldwell-W. Caldwell Bd. of Educ.*, 804 F. Supp. 2d 305,

318-19 (D.N.J. 2011) (granting summary judgment on the plaintiffs' substantive due process

claim where a teacher's use of a "basket hold" and "papoose hold" to restrain the plaintiff, who

was autistic, when he hit, bit, kicked, and pulled the hair of his teachers, aides, and fellow

students did not rise to the level of conscience-shocking as a matter of law).

Moreover, even if a jury reasonably could find that the imposition of the chair restraints

constituted a constitutional violation, the Supervisory Defendants would be entitled to qualified

immunity because it would not have been clear to a reasonable person at the time of the restraints

that their actions violated Reece's constitutional rights.  "Qualified immunity shields government

officials from civil damages 'unless their conduct violated "clearly established statutory or

constitutional rights of which a reasonable person would have known."'" *Penate*, 73 F.4th at 17 (quoting *Lawless v. Town of Freetown*, 63 F.4th 61, 67 (1st Cir. 2023)). The qualified immunity analysis consists of two prongs, which can be addressed in any order. *Id.* "The first prong asks 'whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right,'" which the court has already answered in the negative. *Id.* at 17 (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)). Nevertheless, the court goes on to address the "second prong [which] asks whether that right 'was "clearly established" at the time of the defendant's alleged violation.'" *Id.* at 17-18 (quoting *Maldonado*, 568 F.3d at 269). The latter inquiry is further divided into two aspects, with one aspect focused on the "clarity of the law" and the other "more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.* (quoting *Maldonado*, 568 F.3d at 269). While "[a] plaintiff need not find an identical case concluding that a constitutional violation occurred," *Penate*, 73 F.4th at 18 (citing *Begin v. Drouin*, 908 F.3d 829, 836 (1st Cir. 2018)), "a plaintiff [does] ha[ve] the burden to identify 'controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal in the particular circumstances that he or she faced.'" *Id.* (quoting *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018)).

To further complicate matters, in cases alleging supervisory liability, the qualified immunity test is further refined. *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019). "The 'clearly established' inquiry as to supervisors is bifurcated and is satisfied only when '(1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his

subordinates in that context.'"  *Id.* (quoting *Camilo-Robles*, 151 F.3d at 6).  "In other words, for a supervisor to be liable there must be a bifurcated 'clearly established' inquiry – one branch probing the underlying violation, and the other probing the supervisor's potential liability." *Camilo-Robles*, 151 F.3d at 6.  Where the constitutional right and the availability of supervisory liability are both clearly established, "the qualified immunity analysis 'reduces to the test of objective legal reasonableness.'"  *Penate*, 944 F.3d at 366 (quoting *Camilo-Robles*, 151 F.3d at 6).  The question thus becomes "'whether, in the particular circumstances confronted by [the] [defendant], [the] [defendant] should reasonably have understood that his conduct jeopardized those rights,' whether through deliberate indifference or otherwise."  *Id.* (first and third alteration in original) (quoting *Camilo-Robles*, 151 F.3d at 7).

Plaintiffs do not identify any controlling authority to defeat Defendants' claim to qualified immunity, instead relying on three district court cases from other circuits, those being *K.G. ex rel. Gosch v. Sergeant Bluff-Luton Cmty. Sch. Dist.*, 244 F. Supp. 3d 904 (N.D. Iowa 2017), *Crecy v. Kankakee Sch. Dist. #111*, Case No. 15-CV-1014, 2016 WL 10789394 (C.D. Ill. June 20, 2016), and *W.A. ex rel. S.A. v. Patterson Joint Unified Sch. Dist.*, No CV F 10-1317 LJO SMS, 2010 WL 4746175 (E.D. Cal. Nov. 16, 2010).  While "[d]istrict court decisions 'do not necessarily settle constitutional standards,'" *Ciarametaro v. City of Gloucester*, 87 F.4th 83, 90 (1st Cir. 2023) (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)), particularly those from other circuits, the court examines each of the cases cited by Plaintiffs.

In *K.G.*, the plaintiffs brought § 1983 claims against their seven year-old autistic son's school district, his special education teacher, and his school principal alleging that his fourth and fourteenth amendment rights had been violated when the teacher "dragged" him by his feet up to more than four feet until he complained of pain after he spent ten minutes on the floor flailing

and whining, and at some point kicking, as a result of being prompted to move from one activity to the next. *Id.*, 244 F. Supp. 3d at 910-11. The court granted summary judgment to the defendants on the plaintiffs' fourteenth amendment claim, finding that there was no genuine issue of material fact that the teacher had acted without malice and further that the defendants were entitled to qualified immunity because a reasonable person in her position would not have known that her conduct violated the child's constitutional rights where there was no evidence that she acted with an improper motivation. *Id.* at 927-28. However, the court denied summary judgment on the plaintiffs' fourth amendment claim against the teacher where the plaintiffs' and the defendants' experts agreed that it would be "improper" to drag a child as a form of discipline or control, and the plaintiffs had submitted a medical opinion that the child's injuries were consistent with excessive force in dragging a child on a carpeted surface that went beyond what would be considered normal care and discipline of a 7 year-old child. *Id.* at 911, 925-26. This evidence created a genuine issue or material fact as to whether the teacher's conduct was a "substantial departure" from accepted professional judgment, practice, or standards. *Id.* at 926. The court also denied summary judgment to the school principal on the plaintiffs' fourth amendment claim, finding a genuine dispute as to whether she exhibited deliberate indifference by failing to ensure that staff were adequately trained and supervised in the use of force and restraint of special education students. *Id.* at 925-26. Finally, the court denied summary judgment on qualified immunity grounds but did so without any discussion of why. *Id.* at 928.

In *Crecy*, the plaintiffs sued their 15 year-old son's school district and a paraprofessional for violation of his constitutional rights when the paraprofessional restrained their son, who suffered from bi-polar disease and other psychological disorders. *Id.*, 2016 WL 10789394, at *1. The court first determined that it would analyze the plaintiffs' claim, which was brought under

both the fourth and fourteenth amendments, under the fourth amendment only. *Id*. at *10. The court then held that, viewing the evidence in the light most favorable to the plaintiffs and drawing all reasonable inferences in their favor, as it was required to do on the defendants' motion for summary judgment, the record could support a finding that the paraprofessional, who was trying to prevent the re-instigation of a fight between the plaintiffs' son and another student and who weighed twice as much as the child, used excessive force when he grabbed the child by his neck and put him in a "chokehold," did so a second time after being told by staff not to touch his neck, and then purposefully slammed him to the ground. *Id*. at 11. It was undisputed that grabbing the child by his neck violated district policy. *Id*. at *11. The opinion does not contain any qualified immunity analysis.

Finally, in *W.A.*, the plaintiffs sued their autistic son's school district, one of his teachers, and an aide for, *inter alia*, violation of their son's fourth amendment rights when school personnel performed a number of two-person prone restraints on him. *Id.*, 2010 WL 4746175, at *1. The defendants moved to dismiss on qualified immunity grounds. *Id*. at *10. The court denied the defendants' motion finding first that "'[t]he right of a student to be free from excessive force at the hands of teachers employed by the state was clearly established as early as 1990,'" *id*. at *10 (quoting *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1178 (9th Cir. 2007)), and second that it was unable to determine the reasonableness of the defendants' actions in light of the circumstances, the details of which were not included in the complaint. *Id*.

To determine whether Plaintiffs have met their burden of identifying a "robust consensus of persuasive authority" by identifying these three decisions, the court must start by "defining the right at issue at 'an appropriate level of generality.'" *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir.

2014) (quoting *Brady v. Dill*, 187 F.3d 104, 115 (1st Cir. 1999)).  This requires the court to "analyze whether the law is clearly established '"'in light of the specific context of the case, not as a broad general proposition.'"'"  *Id*. at 368 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).  Thus, the relevant question is not whether the fourth amendment generally prohibited the use of excessive force by school personnel on students, but rather whether, in 2017, Reece, a student with autism and a history of self-injury, had a clearly established right not to be restrained while he was seated in a chair by school personnel who were trying to prevent him from continuing to engage in self-injurious behavior.  "To be clearly established, the contours of this right must have been 'sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"  *Hunt*, 773 F.3d at 368 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2012)).  This requires that "'"existing precedent must have placed the ... constitutional question beyond debate."'"  *Id*. (alteration in original) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).  The court concludes that Plaintiffs have not met their "'heavy burden'" of demonstrating that the law was clearly established at the time of the alleged violation of Reece's rights.  *Estate of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (quoting *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021)).

In assessing a qualified immunity defense in the fourth amendment context, a court should "'typically reason by analogy, asking whether there is any prior case in which the use of force was deemed unlawful under circumstances reasonably similar to those present in the case at hand.'"  *Penate*, 73 F.4th at 21 (quoting *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018)).  Neither *K.G.*, *Crecy*, nor *W.A.* are sufficiently similar to have rendered it beyond debate that imposing a chair hold on Reece under the circumstances presented on any of the three occasions of restraint at issue here was objectively unreasonable.  None of the cases

involved a chair hold, which is the action challenged here, and they are unhelpful to Plaintiffs for other reasons as well.  *W.A.*, which involved two-person prone restraints, was decided on a motion to dismiss and involved a complaint that was devoid of details regarding any of the circumstances surrounding the imposition of the restraints.  Thus, it cannot be said to contribute to a consensus of cases clearly establishing anything other than, perhaps, the broad general proposition that a student has a constitutional right to be free from excessive force at the hands of teachers employed by the state.

*Crecy* and *K.G.* were summary judgment cases and, hence, involved developed records, but they are distinguishable on their facts.  In *Crecy*, the paraprofessional, who was 240 pounds to the student's 120, grabbed the student by the neck, put him in a chokehold – which, by definition, restricts the recipient's ability to breathe in a manner designed to subdue – and slammed him onto the ground.  Further, it was undisputed that district policy prohibited grabbing a student by the neck, and the paraprofessional grabbed the minor by his neck a second time after being told not to do so.  In contrast, here, while there is a dispute about whether chair holds were prohibited by district policy, it is undisputed that Defendants were trained to use chair holds in a state-approved program and could reasonably believe they were an appropriate form of restraint. Finally, *K.G.* involved dragging a seven year-old by his feet across a carpeted floor, and the plaintiffs had submitted a medical opinion that the child's injuries were consistent with excessive force in dragging a child on a carpeted surface that went beyond what would be considered normal care and discipline of a 7 year-old child.  Here, while Plaintiffs have submitted an affidavit from Monson's former Director of Pupil Services stating her view that restraint of a student in a chair violates Massachusetts restraint regulations (Dkt. No. 68), it does not establish that imposing a chair hold, which Defendants were admittedly trained to do, constituted a

"substantial departure" from accepted professional judgment, practice, or standards such that it would be unreasonable to do so.  Thus, none of these cases individually would have put reasonable school personnel on notice in 2017 that the use of a chair restraint on a student who was engaging in self-injurious behavior constituted excessive force, much less do they create a robust consensus to that effect.  Therefore, Plaintiffs have failed to meet their burden of showing that Defendants violated Reece's clearly established rights.  Accordingly, Defendants are entitled to summary judgment on qualified immunity grounds.

One final issue bears addressing before moving on to the Plaintiffs' next claim.  While no such claim is included in their amended complaint, Plaintiffs argue in opposing Defendants' motion for summary judgment, that supervisory liability under § 1983 should attach for denial of medical care to Reece in violation of the fourteenth amendment.  They point to Metzger directing the EMS personnel he called to the high school following Reece's loss of consciousness after the third restraint not to treat Reece, allegedly to comply with a directive from the Kellers.  However, neither Joi Lynn nor Joel had communicated such a directive to anyone in the district.  Plaintiffs state that liability has attached under § 1983 in circumstances where plaintiffs have been denied medical care, citing to two cases.  *See Howe v. Town of N. Andover*, 854 F. Supp. 2d 131 (D. Mass. 2012); *Jarvis v. McLaughlin*, Civil Action No. 1:20-cv-02028-CNS-GPG, 2022 WL 4388399 (D. Colo. Sept. 22, 2022).  The court declines to consider this argument on the ground that "'"issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."'"  *Mackey v. Town of Tewksbury*, 433 F. Supp. 3d 116, 174 (D. Mass. 2020) (quoting *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 37 (1st Cir. 2007)).  Merely noting that "liability … has attached" in other cases with very different facts without making any argument for why it should attach in this case – such as explaining how

Reece's medical need was "serious" or how the actions of any of the Defendants amounted to deliberate indifference as opposed to inadvertence or negligence – is insufficient. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Thus, Defendants are entitled to summary judgment on Count One of Plaintiffs' amended complaint seeking to impose supervisory liability pursuant to 42 U.S.C. § 1983 because Plaintiffs have not established that a constitutional violation occurred and, even if they had, the Supervisory Defendants would be entitled to qualified immunity.

   B.   Count II: *Monell* Liability Against the Town of Monson

   Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), municipal entities can be held liable on a § 1983 claim only when the violation of the plaintiff's rights can be attributed to the official policy, edicts, or acts of that entity itself. *Id.* at 694-95. Thus, municipal liability under Monell has "two basic elements: first, that the plaintiff's harm was caused by a constitutional violation, and second, that the [municipal defendants] be responsible for that violation." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25-26 (1st Cir. 2005) (citing *Collins*, 503 U.S. at 120). Plaintiffs argue that *Monell* liability attaches against Monson because it had a municipal policy, custom, or practice of failing to ensure that the district restraint policy was being followed and of failing to adequately train and supervise teachers and school personnel with respect to the imposition of restraints on students.

   Plaintiffs' *Monell* claim is not difficult to resolve. "[Monson] is only liable under section 1983 if the execution of a policy, practice, or custom of the [Town] caused a violation of [Reece's] constitutional rights." *Montel v. City of Springfield*, 386 F. Supp. 3d 67, 79 (D. Mass.

2019) (citing *Monell*, 436 U.S. at 663 n.7, 694; *Baron v. Suffolk Cty. Sheriff's Dep't*, 402 F.3d

225, 236 (1st Cir. 2005), *abrogated on other grounds, Jennings v. Jones*, 587 F.3d 430 (1st Cir.

2009)).  As already discussed, Plaintiffs have "not proffer[ed] sufficient evidence of a

constitutional violation to overcome summary judgment on count[ ] I …, [and so their] claim for

municipal liability premised on such a violation fails."  *Id*.  *See also City of Los Angeles v.

Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("[N]either *Monell* … nor any of our other cases

authorizes the award of damages against a municipal corporation based on the actions of one of

its officers when in fact … the officer inflicted no constitutional harm."); *Evans v. Avery*, 100

F.3d 1033, 1040 (1st Cir. 1996) ("[W]e follow *Heller's* clear rule and hold that the City cannot

be held liable absent a constitutional violation by its officers." (citing *de Feliciano v. de Jesus*,

873 F.2d 447, 449 (1st Cir.), *cert. denied*, 493 U.S. 850 (1989))).

    Even if Plaintiffs had established a constitutional violation, however, their claim for

municipal liability would still fail.  A failure to train theory "can only yield liability against a

municipality where that city's failure to train reflects deliberate indifference to the constitutional

rights of its inhabitants."  *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).  "[A] training

program must be quite deficient in order for the deliberate indifference standard to be met: the

fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to

make such a showing."  *Young*, 404 F.3d at 27 (citing *City of Canton*, 489 U.S. at 391) (further

citations omitted).  "A pattern of similar constitutional violations by untrained employees is

'ordinarily necessary' to demonstrate deliberate indifference for purposes of [a] failure to train"

claim.  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Bd. of Cnty. Comm'rs of Bryan

Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).  Nevertheless, "'in a narrow range of circumstances,'

a pattern of similar violations might not be necessary to show deliberate indifference," *id*. at 63

(quoting *Bryan Cnty.*, 520 U.S. at 409), and a single incident can suffice where "'the need for more or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights." *Hill v. Walsh*, 884 F.3d 16, 24 (1st Cir. 2018) (alteration in original) (quoting *City of Canton*, 489 U.S. at 390). In addition, the plaintiff must show that the deliberately indifferent training "actually caused" the constitutional deprivation. *City of Canton*, 489 U.S. at 391.

Here, Plaintiffs point to certain alleged deficiencies they have identified in Monson's training, including: (1) that Monson violated 603 C.M.R. 46.04(2) by not ensuing that Metzger, Foulis, Lempart, Coldwell, and Slattery completed their annual training within the first month of the school year and by not including in the annual training information about (a) the role of the student, family, and staff in preventing restraint, (b) the program's restraint prevention and behavior support policy and procedures, (c) interventions that may preclude the need for restraint, including de-escalation, (d) administering physical restraint in accordance with medical or psychological limitations, known or suspected trauma history, and behavioral intervention plans, and (e) identification of program staff who have received in-depth training; (2) that Clarke failed to identify Safety Care as the method of physical restraint in the written restraint procedures documents she developed; and (3) that, while Monson was free to choose Safety Care over CIS, the district failed to train staff with respect to the restraint of Reece in particular. However, "[g]eneral showings of insufficient training are inadequate to prove liability under a failure to train theory." *Miller v. Pugliese*, C.A. No. 20-10660-MLW, 2023 WL 6202373, at *9 (D. Mass. Sept. 22, 2023).

Because Plaintiffs have not identified any instances that could establish a pattern of similar constitutional violations by inadequately trained employees, the only manner in which

they can demonstrate deliberate indifference is by showing that there was an obvious need for more or different training without which a violation of constitutional rights would surely result. *Hill*, 884 F.3d at 24. Plaintiffs cannot make such a showing on this record. It is undisputed that Monson trained its employees, including Defendants, in the administration of restraints on students. Lempart attended a three-day training in the spring of 2017 at Safety Care's offices to become a certified Safety Care trainer, and he, in turn, trained Metzger, Foulis, Degnan, Hess, Slattery, Coldwell, and Valencourt during the summer of 2017. Those trainings, which lasted several days, included classroom instruction as well as hands on practice, and encompassed de-escalation techniques. Monson also had a physical restraint policy in effect and distributed an annual mandatory training to all staff, which the individual Defendants certified that they had completed for the 2017/2018 school year. Given this record, the evidence in the record does not establish that the restraint training Monson provided was inadequate so as to "amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (alteration in original) (quoting *City of Canton*, 489 U.S. at 388).

Plaintiffs also make a passing claim that Monson is subject to *Monell* liability because it had a "custom" of failing to ensure that its restraint policy was followed. "A municipality may be liable for an unconstitutional municipal custom if it is 'so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet [do] nothing to end the practice.'" *Britton v. Maloney*, 901 F. Supp. 444, 449–50 (D. Mass. 1995) (alteration in original) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989), *cert. denied*, 493 U.S. 820 (1989)). "To establish a claim against a municipality on the basis of custom, a plaintiff must prove a practice so 'permanent and well

settled as to constitute a "custom or usage" with the force of law.'" *Armstrong v. Lamy*, 938 F. Supp. 1018, 1035 (D. Mass. 1996) (quoting *Monell*, 436 U.S. at 691).  In resisting summary judgment, Plaintiffs argue that they "will show that the Town's practice of allowing staff to restrain Reece in violation of the state and District policies to the contrary" satisfies this standard (Dkt. No. 65 at 16).  But they fail to make such a showing.  Instead, Plaintiffs rely solely on the two or three chair restraints imposed on Reece, which are insufficient to show that the practice was "'so widespread as to have the force of law.'" *Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997) (quoting *Bryan Cty.*, 520 U.S. at 404).  Thus, Defendants are entitled to summary judgment on Count II of Plaintiff's amended complaint seeking to impose *Monell* liability on Monson.

   C.   <u>Remaining State Law Claims</u>

       Having resolved Plaintiffs' two federal claims, this leaves the five state law claims, including for violation of the Massachusetts Civil Rights Act ("MCRA") (Count III), negligence (Count IV), negligent infliction of emotional distress (Count V), intentional infliction of emotional distress (Count VI), and loss of consortium (Count VIII).  These claims are in federal court solely because of an exercise of supplemental jurisdiction, 28 U.S.C. § 1367, and, at this point, no federal claims remain.  "[T]he Supreme Court has instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  Pursuant to this guidance, the First Circuit has "held that, when all federal claims have been dismissed, it is an abuse of discretion for a district court to retain jurisdiction

over the remaining pendent state law claims unless doing so would serve 'the interests of fairness, judicial economy, convenience, and comity.'"  *Id.* (citing *Desjardins v. Willard*, 777 F.3d 43, 45-46 (1st Cir. 2015); *Rivera-Díaz v. Humana Ins. of Puerto Rico, Inc.*, 748 F.3d 387, 392 (1st Cir. 2014)).  In addition, "it can be an abuse of discretion – if no federal claim remains – for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts."  *Id.* (citing *Desjardins*, 777 F.3d at 45-46).  Thus, this court must determine whether the claims should be addressed on their merits or remanded in the interests of comity.  *Robinson*, 950 F.3d at 31 (citing *Wilber*, 872 F.3d at 22-23); *see also Senra v. Town of Smithfield*, 715 F.3d 34, 41 (1st Cir. 2013) ("'[T]he termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction, but, rather, sets the stage for an exercise of the court's informed discretion.'") (quoting *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 256-57 (1st Cir. 1996))).  With this authority in mind, the court turns to Plaintiffs' state law claims.

In Count III, Plaintiffs seek to impose liability on the individual Defendants for violation of the MCRA, which provides a right of action to any person whose exercise of state or federal constitutional rights has been interfered with, or attempted to be interfered with, by any person or persons, whether or not acting under color of law, "by threats, intimidation, or coercion."  Mass. Gen. Laws ch. 12, § 11H.  "On its face, the MCRA contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do."  *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).  "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act."  *Longval v.*

*Comm'r of Corr.*, 535 N.E.2d 588, 593 (Mass. 1989) (citing *Pheasant Ridge Assocs. Ltd. P'ship*
*v. Burlington*, 506 N.E.2d 1152, 1158 (Mass. 1987)).  "Rather, to be actionable, a defendant's
actions must amount to 'an attempt to force someone to do something the person is not lawfully
required to do.'"  *Farrah v. Gondella*, 725 F. Supp. 2d 238, 248 (D. Mass. 2010) (quoting
*Freeman v. Planning Bd. of W. Boylston*, 646 N.E.2d 139, 149 (Mass. 1995)).

Here, Plaintiffs purport to base their claim under the MCRA on the deprivation of
Reece's rights to be free from the excessive use of force under the fourth amendment to the
United States Constitution and to a public education under the Massachusetts Constitution.
Because the Massachusetts Supreme Judicial Court has held that "'the Legislature intended to
provide a remedy under [the MCRA] coextensive with 42 U.S.C. § 1983 ... except that the
Federal statute requires State action whereas its State counterpart does not," *Duarte v. Healy*,
537 N.E.2d 1230, 1232 (Mass. 1989) (second alteration in original) (quoting *Batchelder v. Allied*
*Stores Corp.*, 473 N.E.2d 1128, 1131 (Mass. 1985)), the individual Defendants are entitled to
summary judgment to the extent Plaintiffs' claim is based on an alleged fourth amendment
violation.  Moreover, even if there was a fourth amendment violation, the individual Defendants
would nevertheless be entitled to summary judgment based on qualified immunity, which the
SJC has also found to be coextensive with the qualified immunity that applies to claims asserted
under § 1983.  *Id*.  *See also Wilber*, 872 F.3d at 23-24 (affirming the district court's grant of
summary judgment on the plaintiff's MCRA claim because its reason for affirming the grant of
summary judgment on his § 1983 claim "compel[led] that result").

The same cannot be said of Plaintiffs' claim regarding the deprivation of Reece's state
constitutional right to a public education.  Plaintiffs allege Defendants threatened, intimidated, or
coerced him into giving up his educational rights by sending the September 22, 2017, letter

threatening a long-term suspension or expulsion or a unilateral change in his placement, then followed up by threatening a residential placement.  Because Plaintiffs have identified evidence that might allow a rational factfinder to conclude that at least some of the individual Defendants engaged in conduct that might rise to the level of actual or attempted "threats, intimidation, or coercion," and have pointed to authority for the proposition that the Massachusetts constitution confers a right to public education, *McDuffy v. Secretary of the Executive Office of Education*, 615 N.E.2d 516, 555-56 (Mass. 1993), summary judgment is not plainly warranted.  Therefore, both the interests of comity and application of the principle that substantial questions of state law are better addressed by state courts counsel that the court decline to exercise supplemental jurisdiction over the aspect of Plaintiffs' MCRA claim that is predicated on violation of the state constitution.  The court will remand this aspect of Plaintiffs' MCRA claim to state court.

Counts IV and V, which are stated against the Town of Monson only, are for negligence under Mass. Gen. Laws ch. 258 § 2, and for negligent infliction of emotional distress.  Pursuant to Mass. Gen. Laws ch. 258 § 2, public employers can be held liable for injury caused by the negligent or wrongful acts or omissions of public employees acting within the scope of their employment.  The parties dispute whether certain provisions of Mass. Gen. Laws ch. 258 § 10, which provides for sovereign immunity as to certain claims by excluding them from the operation of Mass. Gen. Laws ch. 258 § 2, apply.  Specifically, Defendants maintain that § 10(b), which applies to discretionary functions, bars Plaintiffs' claim to the extent it rests on Clarke's discretionary decision with respect to the training provided, and that § 10(j), which applies to failures to act to prevent or diminish the harmful consequences of a condition or situation, bars Plaintiffs' claim to the extent it is based on any failure to prevent or mitigate harm attributable to Reece's self-injurious behavior.  Plaintiffs counter that § 10(b) is inapplicable because the record

supports a finding that Monson High School staff failed to implement and execute policy and planning, including its own restraint policy and Reece's BSP, removing their actions from § 10(b) immunity, and that § 10(j) is inapplicable because Reece was not injured by the actions of a third party but rather by the actions of Monson employees who negligently restrained him. Because interpretation of the provisions of Mass. Gen. Laws ch. 258, § 10 is best left to state courts, and "[t]here is no analogue to . . . these . . . [negligence] claims in the federal-law claims" already addressed, *Robinson v. Town of Marshfield*, 950 F.3d 21, 32 (1st Cir. 2020), the court exercises its discretion to decline to exercise supplemental jurisdiction over Counts IV and V and remands them to state court. *See Zell v. Ricci*, 957 F.3d 1, 17–18 (1st Cir. 2020) (vacating dismissal with prejudice of a state-law negligence claim "implicat[ing] [state] law, school policies, and localized concerns," that did not share "any analytical nexus with the [dismissed] federal claims," and remanding it to the district court for dismissal without prejudice).

Count VI asserts a claim for intentional infliction of emotional distress against the individual Defendants.  Defendants move for summary judgment on the ground that discovery has failed to reveal sufficiently egregious conduct on the part of any of the individual Defendants.  Plaintiffs counter that the following evidence suffices to meet the standard of "extreme and outrageous" conduct, "beyond all possible bounds of decency," and "utterly intolerable in a civilized community," *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 319 (Mass. 1976) (quoting Restatement (Second) of Torts § 46, comment d (1965); *George v. Jordan Marsh Co.*, 268 N.E.2d 915, 921 (Mass. 1971)): Clarke wanted Reece out of the Monson public schools; Morneau threatened to place Reece in a residential school; Foulis lied about writing the September 22, 2017, letter and about not speaking to anyone about it, when she did not write the letter and she did speak to Clarke; Defendants falsely accused Reece of assaulting and inflicting

substantial bodily injury in the September 22, 2017, letter; Metzger lied to EMS personnel about Reece's parents not wanting him to be treated; Defendants restrained Reece in violation of state regulations and District policy; Foulis lied about her involvement in the second restraint; Hess failed to report that Reece sustained concussions in the first and third restraints; Hess failed to report that Reece banged his head on a radiator several times during the second restraint; and Hess and Metzger did not tell Joi Lynn that Reece had injured his head during the second restraint when they met with her that day.  Mindful that it is not enough "'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized with "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort,'" *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quoting Restatement (Second) of Torts § 46, comment d (1965)), the court finds that the record evidence viewed in the light most favorable to Plaintiffs, including the preceding evidence highlighted by Plaintiffs, does not reveal misconduct by the individual Defendants that rises to a level that a reasonable jury could find  "atrocious" and "utterly intolerable in a civilized community," and, therefore, it is appropriate for the court to exercise supplemental jurisdiction and grant summary judgment to Defendants on this claim. *Delaney v. Town of Abington*, 890 F.3d 1, 12 (1st Cir. 2018) (quoting *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014) (affirming the district court's exercise of supplemental jurisdiction over the plaintiff's intentional infliction of emotional distress claim following dismissal of all federal claims and affirming the grant of summary judgment).

Finally, in Count VIII of their amended complaint, Plaintiffs seek damages from the individual Defendants for Joi Lynn's and Joel's loss of consortium with Reece pursuant to Mass. Gen. Laws ch. 231, § 85X, which provides that "[t]he parents of a minor child … shall have a

cause of action for loss of consortium of the child who has been seriously injured against any person who is legally responsible for causing such injury."  The individual Defendants move for summary judgment on the ground that there can be no recovery under Mass. Gen. Laws ch. 231, § 85X when there is no underlying tortious act.  *See Doe v. Dennis-Yarmouth Reg'l Sch. Dist.*, 578 F. Supp. 3d 164, 183 (D. Mass. 2022).   Plaintiffs counter that their loss of consortium claim is predicated on Defendants violation of the MCRA and intentional infliction of emotional distress, and, thus, is viable.  While the court has determined that it is appropriate to grant summary judgment to Defendants on Plaintiffs' intentional infliction claim, the court is dismissing the MCRA claim without prejudice in part.  It may not be likely that the SJC would recognize a claim for loss of consortium ancillary to an action under the MCRA.  *See Columbus v. Biggio*, 76 F. Supp. 2d 43, 59 (D. Mass. 1999) ("[N]either federal or Massachusetts civil rights claims may serve as the basis for loss of consortium claims." (citations omitted)).  However, where the SJC has not addressed the issue, it is not a foregone conclusion.  *See Lorenc v. Be Free, Inc.*, 136 F. Supp. 2d 1, 4 n.3 (D. Mass. 2001) ("[T]he civil rights violations … are more akin to actions in tort and hence could conceivably give rise to a consortium claim." (citations omitted)).  Thus, instead of predicting how the SJC would decide if presented with the question, the court declines to exercise supplemental jurisdiction over Plaintiffs' loss of consortium claim and will remand it to state court.

## IV.    CONCLUSION

For the above-stated reasons, Defendants' motion for summary judgment (Dkt. No. 48) is GRANTED with respect to Counts I and II alleging federal claims under 42 U.S.C. § 1983, Count III for violation of the MCRA insofar as it is based on the deprivation of Reece's right to be free from the excessive use of force under the fourth amendment to the United States

Constitution, and Count VI for intentional infliction of emotional distress.  However, the motion is DENIED with respect to Count III for violation of the MCRA insofar as it is based on Reece's right to a public education under the Massachusetts Constitution, Count IV for negligence, Count V for negligent infliction of emotional distress, and Count VIII for loss of consortium, which claims will be remanded to state court.  The Clerk's Office is directed to close the case on the court's docket.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: March 22, 2024